# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Suzanne B. Conlon | Sitting Judge if Other than Assigned Judge | Morton Denlow |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8643 | **DATE** | 8/11/2003 |
| **CASE TITLE** | Edwena A. Hegna, et al. vs. Islamic Republic of Iran, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Report and Recommendation. It is recommended that the Court deny the United States' motion to quash the writs of attachment [19-1] and grant the Plaintiff's motion for a turnover order [18-1]. It is further recommended that the turnover be stayed pending final resolution of the District of Columbia case. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | AUG 1 2 2003 | | 31 |
| | Docketing to mail notices. | | date docketed | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| ✓ | Copy to judge/magistrate judge. | | 8/11/2003 | | |
| | | | date mailed notice | | |
| DK | courtroom deputy's initials | | DK | | |
| | | | mailing deputy initials | | |

U.S. DISTRICT COURT
CLERK
03 AUG 11 PM 1:31
FILED FOR DOCKETING
ED-7
Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| EDWENA A. HEGNA, individually and as executor of the Estate of Charles Hegna deceased, CRAIG HEGNA, STEVEN HEGNA, LYNN HEGNA, and PAUL HEGNA,<br><br>            Plaintiffs,<br><br>   v.<br><br>ISLAMIC REPUBLIC OF IRAN and THE IRANIAN MINISTRY OF INFORMATION AND SECURITY,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **DOCKETED**<br><br>AUG 1 2 2003<br><br>Case No. 02 C 8643<br><br>Magistrate Judge Morton Denlow |

TO:   **THE HONORABLE SUZANNE B. CONLON**
       **UNITED STATES DISTRICT JUDGE**

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

This matter concerns the efforts of Edwena A. Hegna, individually and as executor of the estate of Charles Hegna, Craig Hegna, Steven Hegna, Lynn Marie Hegna Moore, and Paul Hegna ("Plaintiffs") to satisfy the $375,000,000 default judgment they obtained over two years ago against the Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") (collectively "Defendants") for their sponsorship of the terrorist group Hezbollah, which was responsible for the murder of Charles Hegna.

Jurisdiction was predicated upon the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C.A. § 1605(a)(7).

The case is currently before the Court on Plaintiffs' writs of attachment upon two parcels of Chicago real estate owned by Iran and their motion for a turnover order of these properties. The United States has intervened to quash the writs of attachment.[1] The United States contends that the specific properties identified by the Plaintiffs' writs are Iranian consular properties, and are not subject to attachment. Additionally, the United States argues that these properties are used exclusively for diplomatic purposes and are not considered "blocked assets" under section 201 of the Terrorism Risk Insurance Act ("TRIA"), Pub. L. No. 107-297, Title II, § 201(d), 116 Stat. 2337 (2002); 28 U.S.C.A. § 1610 note, and are therefore not subject to attachment. Lastly, the United States claims that the real properties are exempt from writs of attachment under pre-TRIA authority.

For the reasons stated herein, the Court finds that these properties are not immune from attachment under the TRIA, and recommends that the United States' motion to quash the writs of attachment be denied and the Plaintiffs' motion for a turnover order be granted. The Court further recommends that the turnover be stayed pending final resolution of a companion case pending in the District of Columbia.

---

[1] The United States intervened in this suit pursuant to 28 U.S.C.A. § 517 (1991), which provides that the United States may appear in any court in the United States "to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

## II. BACKGROUND AND PROCEDURAL HISTORY

On December 4, 1984, members of Hezbollah, a terrorist organization sponsored by the Islamic Republic of Iran, hijacked a Kuwaiti Airlines aircraft bound for Pakistan while in international airspace over the Gulf of Oman. One of the passengers on the plane was Charles Hegna, an American citizen employed by the United States Agency for International Development. The terrorists ultimately forced the pilot to land at Iran's Tehran Airport. Shortly after the aircraft landed, the terrorists fatally shot Mr. Hegna and pushed him out the door onto the airport tarmac.

On January 22, 2001, the United States District Court for the District of Columbia entered a default judgment against Defendants in the amount of $42,000,000 in compensatory damages and $333,000,000 in punitive damages. See *Hegna v. Iran*, Civil Action No. 1:00 CV 00716 (D.D.C. 2001). The Plaintiffs' attempts to collect the judgment have been unsuccessful.

On January 21, 2003, Plaintiffs obtained writs of attachment from this Court attaching two parcels of real property owned by Iran, located in Chicago, Illinois. The two properties are commonly known as Units 3511 and 3512 at 155 N. Harbor Drive, Chicago, Illinois 60601 ("condominiums"). The condominiums were leased by the State Department's Office of Foreign Missions ("OFM") to private citizens. At oral argument, the government stated that the condominiums are currently vacant. The United States seeks to quash the writs of attachment against the condominiums because they are Iranian diplomatic and consular

3

properties. See *United States v. Central Corp. of Illinois*, No. 87 C 5072, 1987 U.S. Dist. LEXIS 10770, at \*5 (N.D. Ill. Nov. 13, 1987) (finding that the government of Iran is the owner of the condominiums).

The United States raises two issues in its motion to quash the writs of attachment: (1) whether the TRIA overrides any immunity from execution under the Vienna Conventions, FSIA, or the Foreign Missions Act ("FMA"), and (2) whether the Iranian diplomatic and consular properties in the custody of the Department of State are collectable under TRIA section 201(a) because they are "blocked assets."

## III. LEGISLATIVE BACKGROUND

Before analyzing the issues at hand, an understanding of congressional efforts to eliminate the ambiguity surrounding the application of foreign sovereign immunity is helpful in putting this case in proper context. Therefore, this Court will review relevant treaties, legislation, and circumstances before analyzing the issues before the Court.

### A.    VIENNA CONVENTIONS

The Vienna Convention on Diplomatic Relations ("VCDR") was signed on June 29, 1961 by the United States. The parties to the Vienna Convention recognized that an "international convention on diplomatic intercourse" would "contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems." Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502. Additionally, the parties to the Vienna

4

Convention had in mind, "the purposes and principles of the Charter of the United Nations concerning the sovereign equality of States, the maintenance of international peace and security, and the promotion of friendly relations among nations. . . ." *Id.*

The Vienna Convention requires a host country to take steps to protect the property of diplomatic missions. *Id.* at art. 22. Under Article 45(a) of the VCDR, if diplomatic relations are broken or if a mission is permanently or temporarily recalled, "the receiving State must, even in the case of armed conflict, respect and protect the premises of the mission, together with its property and archives. . . ." *Id.* This obligation flows from Article 25 of the VCDR, which provides that "[t]he receiving State shall accord full facilities for the performance of the functions of the mission." *Id.*; see also *Liberian Eastern Timber Corp. v. Government of the Republic of Liberia*, 659 F. Supp. 606, 608 (D.D.C. 1987). Likewise, Article 27 of the Vienna Convention on Consular Relations ("VCCR") contains the same obligation with respect to consular premises and property. April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820. The Chicago properties fall within the protection of the VCDR and VCCR because the United States is obligated to respect and protect the premises of a foreign mission if the mission is temporarily or permanently recalled. *Id.*

## B.    FOREIGN MISSIONS ACT

The Office of Foreign Missions ("OFM") was created by the 1982 Foreign Missions Act ("FMA"), 22 U.S.C. § 4301 *et seq*. The policy behind the FMA was "to support the secure and efficient operation of the United States missions abroad, to facilitate the secure

and efficient operation in the United States of foreign missions and public international organizations and official missions to such organizations . . . and to require their observance of corresponding obligations in accordance with international law." 22 U.S.C. § 4301.

The FMA stipulates that "[i]f a foreign mission has ceased conducting diplomatic, consular, and other governmental activities in the United States and has not designated a protecting power or other agent approved by the Secretary to be responsible for the property of that foreign mission, the Secretary– (1) until the designation of a protecting power or other agent approved by the Secretary, may protect and preserve any property of that foreign mission. . . ." 22 U.S.C. § 4305(c)(1).

The FMA also prohibits the attachment of or execution upon such mission property being held by the Department of State. 22 U.S.C. § 4308(f). Specifically, it provides that "[a]ssets of or under the control of the Office of Foreign Missions, wherever situated, which are used by or held for the use of a foreign mission shall not be subject to attachment, execution, injunction, or similar process, whether intermediate or final." *Id.*

## C.    FOREIGN SOVEREIGN IMMUNITIES ACT

In 1976 Congress enacted the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. §§ 1602-1611. The FSIA states the general principle that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. In order to obtain jurisdiction over a foreign state defendant in a United States court, a plaintiff could bring suit only under one of several enumerated exceptions listed in the FSIA.

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). Prior to 1996, victims of state-sponsored terrorism had no recourse in the courts of the United States for redress of acts committed by terrorists; such claims were barred by the FSIA and did not fall under one of its exceptions. 28 U.S.C. §§ 1605.

## D. FEDERAL ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT

The 1996 Federal Antiterrorism and Effective Death Penalty Act ("AEDPA") created a specific exception to the FSIA. The AEDPA added a separate exception for certain state-sponsored terrorist acts. Pub. L. No. 104-132, § 221(a)(1), 110 Stat. 1214 (1996) (codified as 28 U.S.C. § 1605(a)(7)). To fall within the purview of this section, plaintiffs are required to establish all of the following: (1) personal injury or death caused by an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; (2) the act was either perpetrated by a foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; (3) the act or provision of material support or resources is engaged in by an agent, official, or employee of the foreign state while acting within the scope of his or her office, agency, or employment; (4) the foreign state has been designated as a state sponsor of terrorism; (5) if the incident occurred within the foreign state defendant's territory, that the plaintiff offered the defendants a reasonable opportunity to arbitrate the matter; and (6) either the plaintiff or the victim was a United States national at the time of the incident. 28 U.S.C. § 1605(a)(7); *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 149 (D.D.C. 2002), *aff'd by* 333 F.3d 228 (D.C. Cir. 2003).

In yet another 1996 amendment, the Flatow Amendment, Congress permitted awards of both compensatory and punitive damages for personal injury or death caused by an "official, employee, or agent of a foreign state designated as a state sponsor of terrorism" in actions under 28 U.S.C. 1605(a)(7). Pub. L. No. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172; 28 U.S.C.A. § 1605 note; *Roeder*, 195 F. Supp. 2d at 150 n.2 (stating that although the Flatow Amendment was codified only in a note rather than as a freestanding statutory section, "it has been interpreted as being an 'independent pronouncement of law'"). The AEDPA further allows the commercial property of a foreign state located in the United States to be used to satisfy a judgment against that state, regardless of whether the property was involved in the act on which the claim was based. 28 U.S.C. §§ 1610 (a)(7) and 1610 (b)(2).

The AEDPA negates sovereign immunity for foreign nations for actions arising out of "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency. . . ." 28 U.S.C. § 1605(a)(7). Furthermore, the AEDPA provides that a court can hear a claim if the foreign nation sought to be charged was designated a state sponsor of terrorism by the United States Department of State at the time the act occurred. *Id.* Iran was designated a state sponsor of terrorism on January 23, 1984, by then Secretary of State George Schultz, 49 Fed. Reg. 2836-02, and has been designated as such ever since. Thus, the AEDPA opened the doors for the Plaintiffs to

obtain a judgment against Iran and the MOIS.

## E.     AMENDMENTS TO THE AEDPA

As a result of the AEDPA, several suits were filed against Iran pursuant to the exception in §1605(a)(7) of the FSIA. Donna M. Balducci, Note, *American Taxpayers Bear the Burden of Beating Iraq in the Courtroom*, 31 Hofstra L. Rev. 819, 829-33 (2003) (discussing the exception and listing cases against Iran). Because Iran did not actively defend these actions, default judgments were entered. *Id.* Plaintiffs from these earlier suits sought to satisfy the judgments against certain properties and other assets owned by Iran which were within the United States. The Clinton administration opposed these efforts. *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 19 (D.D.C. 1999). In *Flatow*, an attempt was made to attach the Iranian embassy located in Washington D.C., as well as the accrued proceeds from the rental of those properties after diplomatic relations were broken. *Id.* The District Court for the District of Columbia quashed the writs of attachment regarding the real property at issue because the property did not fall within the definition of commercial activity under the FSIA, and thus remained immune from attachment. *Id.* at 23.

In 1998, Congress again amended the FSIA to provide that any property of a terrorist state frozen pursuant to Trading with the Enemy Act ("TWEA") or the International Emergency Economic Powers Act ("IEEPA") and any diplomatic property of such a state could be subject to execution or attachment in aid of a judgment against the state. General Govt. Appropriations Act of 1999, Pub. L. No. 105-277, § 117, 112 Stat. 2681 (1998)

(codified at 28 U.S.C. § 1610 (f)(1)). The amendment also gave the President authority to "waive the requirements of this section in the interest of national security." *Id.* On October 21, 1998, the day this legislation was signed into law, President Clinton exercised his waiver authority in a blanket manner.[2] The President subsequently explained his reasons in the signing statement for the bill as follows:

> I am concerned about section 117 of the Treasury/General Government appropriations section of the act, which amends the Foreign Sovereign Immunities Act. If this section were to result in attachment and execution against foreign embassy properties, it would encroach on my authority under the Constitution to "receive Ambassadors and other public ministers." Moreover, if applied to foreign diplomatic or consular property, section 117 would place the United States in breach of its international treaty obligations. It would put at risk the protection we enjoy at every embassy and consulate throughout the world by eroding the principle that diplomatic property must be protected regardless of bilateral relations. Absent my authority to waive section 117's attachment provision, it would also effectively eliminate the use of blocked assets of terrorist states in the national security interests of the United States, including denying an important source of leverage. In addition, section 117 could seriously affect our ability to enter into global claims settlements that are fair to all U.S. claimants, and could result in U.S. taxpayer liability in the event of a contrary claims tribunal judgment. To the extent possible, I shall construe section 117 in a manner consistent with my constitutional authority and with U.S. international legal obligations, and for the above reasons, I have exercised the waiver authority in the national security interest of the United States.

---

[2] Presidential Determination 99-1 (Oct. 21, 1998), *reprinted in* 34 WEEKLY COMP. PRES. DOC. 2088 (Oct. 26, 1998). *See also* DAVID M. ACKERMAN, CONGRESSIONAL RESEARCH SERVICE, SUITS AGAINST TERRORIST STATES, Congressional Research Service (2002), available at http://www.fpc.state.gov/documents/organization/8045.pdf (last visited Aug. 6, 2003).

Statement by President William J. Clinton upon signing H.R. 4328, 34 WEEKLY COMP. PRES. DOC. 2108 (Nov. 2, 1998), *reprinted in* 1998 U.S.C.C.A.N. 576.

**F.    VICTIMS OF TRAFFICKING AND VIOLENCE PROTECTION ACT OF 2000**

Congress enacted the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), further amending the FSIA. Pub. L. No. 106-386, § 2002, 114 Stat. 1464 (2000). Section 2002 of the VTVPA directs the Secretary of the Treasury to pay portions of previously designated judgments against terrorist states in certain amounts. *Id.* at § 2002(a). In addition, section 2002 again provided for a presidential waiver, stating, "[t]he President may waive any provision of paragraph (1) in the interest of national security." *Id.* at § 2002(f)(3) (codified at 28 U.S.C. §1610(f)(3)).

Immediately after signing the legislation into law on October 28, 2000, President Clinton exercised the substitute waiver authority granted in section 2002 and waived "subsection (f)(1) of section 1610 of title 28, United State Code, in the interest of national security." Presidential Determination No. 2001-03 (Oct. 28, 2000); 65 Fed. Reg. 66483 *available at* 2000 WL 1651614; *see also* DAVID M. ACKERMAN, CONGRESSIONAL RESEARCH SERVICE, SUITS AGAINST TERRORIST STATES, Congressional Research Service, at 15 (2002). Thus, except as otherwise provided in section 2002 regarding specific victims and previous judgments, the inability to attach diplomatic property and blocked assets of terrorist states to satisfy judgments was still in place.

Because the VTVPA only provided for the payment of certain judgments and only for

certain amounts, the Act provided a political compromise for the deadlock that had developed between the legislative and executive branches. W. Michael Reisman & Monica Hakimi, 2001 Hugo Black Lecture: *Illusion and Reality in the Compensation of Victims of International Terrorism*, 54 Ala. L. Rev. 561, 575 (2003).[3]   With respect to the cases provided for in the VTVPA, the Treasury was to make payments from: (1) the rental proceeds accrued on Iran's diplomatic and consular property; and (2) "funds not otherwise made available in an amount not to exceed the total of the amount in the Iran Foreign Military Sales Program account." Pub. L. No. 106-386, § 2002(b)(2)(B), 114 Stat. 1543 (2000). Congress was made aware that when it considered the use of these rental proceeds the conversion of the rents to satisfy judgments were a violation of the VCCR and the VCDR.[4]

---

[3] The payment scheme was originally part of the Justice for Victims of Terrorism Act, but was enacted as part of the VTVPA. W. Michael Reisman & Monica Hakimi, 2001 Hugo Black Lecture: *Illusion and Reality in the Compensation of Victims of International Terrorism*, 54 Ala. L. Rev 561, 576 n.79 (2003).

[4] The Congressional Budget Office ("CBO") remarked when reviewing the House version of what became the VTVPA as follows:

> The United States has a custodial responsibility under international agreements to maintain diplomatic assets belonging to Iran; therefore, the federal government would likely be liable to Iran for the loss of this $5 million from rental proceeds. If those amounts are seized, CBO anticipates the United States would have to promptly reimburse Iran for their value. H.R. Rep. No. 106-733, at 9 (July 13, 2000).

## G.     TERRORISM RISK INSURANCE ACT OF 2002

The Plaintiffs seek the Chicago condominiums pursuant to section 201 of the TRIA. With the enactment of section 201, it is now easier for victims to collect on judgments against Iran, a state that sponsors terrorism. Section 201 is called "Satisfaction of Judgments from Blocked Assets of Terrorists, Terrorist Organizations, and State Sponsors of Terrorism." Pub. L. No. 107-297, Title II, 116 Stat. 2337 (2002); 28 U.S.C.A. § 1610 note. The TRIA was designed to "provide a new, powerful disincentive for any foreign government to continue sponsoring terrorist attacks on Americans." 148 Cong. Rec. S11524, S11527 (2002) (statement of Senator Harkin). The TRIA removes barriers to the attachment of blocked assets by severely limiting the availability of the presidential waiver to protect blocked assets. Pub. L. No. 107-297, Title II § 201(b), 116 stat. 2337 (2002); 28 U.S.C.A. § 1610 note. Prior to the TRIA, legislation permitted the President to exercise a blanket waiver to protect blocked assets. Under the new TRIA, a blanket waiver is no longer allowed since the President is now required to make "an asset-by-asset" determination that "a waiver is necessary in the national security interest." Pub. L. No. 107-297, Title II § 201(b)(1), 116 Stat. 2337 (2002); 28 U.S.C.A. § 1610 note. Moreover, the TRIA contains specific exceptions to the presidential waiver authority. *Id.* at § 201(b)(2). A Conference Report on the bill explains that the new Act "eliminates the effect of any [previous] presidential waiver . . . making clear that all such judgments are enforceable" against blocked assets. 148 Cong. Rec. H8722-06, H8728 (Nov. 13, 2002).

13

The TRIA was overwhelmingly enacted on November 19, 2002[5] and signed into law by President George W. Bush on November 26, 2002. The White House invited Plaintiff Edwena Hegna, Charles Hegna's widow, to be at President Bush's side for the signing ceremony.[6]

The TRIA was specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." 148 Cong. Rec. H8722-06, H8728 (Nov. 13, 2002). The purpose of section 201 was "to provide justice to terrorist victims, to hold terrorist states accountable for their crimes and to deter them from perpetrating acts of terrorism against American citizens in the future." *Hill v. Republic of Iraq*, No. 1:99 CV 03346, 2003 U.S. Dist. LEXIS 3725, at *8 (D.D.C. March 11, 2003) (citing 148 Cong. Rec. S11527 (Nov. 19, 2002) (remarks of Senator Harkin); 148 Cong. Rec. S5510 (June 13, 2002) (remarks of Senator Allen); 148 Cong. Rec. H6134 (Sept. 10, 2002) (remarks of Congressman Fosella and Congressman Cannon)).

---

[5] On November 19, 2002 the TRIA passed based on vote counts of 86 YEAs, 11 NAYs, and 3 Not Voting. United States Senate Roll Call Votes 107th Congress - 2nd Session *available at* http://www.senate.gov/legislative/LIS/roll_call_lists/roll_call_vote_ cfm.cfm?congress=107&session=2&vote=00252 (last visited Aug. 5, 2003).

[6] Joel Nowbray, *Justice, Finally: Congress Helps American Victims of Terror Get Past the State Department*, National Review Online, Nov. 26, 2002, available at http://www.nationalreview.com/mowbray/mowbray112602.asp (last visited Aug. 6, 2003).

## IV. LEGAL ANALYSIS

## A.   THE TRIA OVERRIDES ANY IMMUNITY FROM EXECUTION UNDER THE VIENNA CONVENTION, FSIA, OR THE FMA.

The government contends that the Vienna Convention, the FSIA, and the FMA operate as separate bars to these attachments. The Plaintiffs, on the other hand, assert that they are entitled to enforce their judgments against the condominiums under section 201 of the TRIA, which provides in pertinent part:

> (a) IN GENERAL.—Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, Unites States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

> (b) PRESIDENTIAL WAIVER.—

> (1) IN GENERAL.—Subject to paragraph (2), upon determining on an asset-by-asset basis that a waiver is necessary in the national security interest, the President may waive the requirements of subsection (a) in connection with (and prior to the enforcement of) any judicial order directing attachment in aid of execution or execution against any property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

> (2)  EXCEPTION.—A waiver under this subsection shall not apply to—

> (A) property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations that has been used by the United States for any non-diplomatic purpose (including use as a rental property), or the proceeds of such use; or

(B) The proceeds of any sale or transfer for value to a third party of any asset subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations.

Pub. L. No. 107-297, Title II, § 201, 16 Stat. 2337; 28 U.S.C.A. § 1610 note.

The Plaintiffs also contend that the more recently enacted TRIA abrogates the scope of the Vienna Convention, the FSIA, and the FMA. Contrary to the United States' assertion that the TRIA does not apply, by its plain terms, the TRIA overrides any immunity from execution that blocked Iranian property might otherwise have under these laws by beginning, "Notwithstanding any other provision of law . . ." Pub. L. No. 107-297, Title II, § 201(a), 16 Stat. 2337; 28 U.S.C.A. § 1610 note; *Hill*, 2003 U.S. Dist. LEXIS 3725, at *10 (recognizing that the phraseology is unambiguous and means that the Act "effectively supersedes all previous laws").

Furthermore, the TRIA overrides any immunity from execution that blocked Iranian property might otherwise enjoy under the Vienna Convention, the FSIA, or the FMA based upon TRIA's legislative history. See *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 169-70 (D.D.C. 2002) (noting that if one possible reading of an ambiguous statute and a previously-enacted international agreement conflict a court must inquire into Congress' intent with respect to the abrogation of the international agreement prior to giving force to the statute); *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982). Indeed, any contrary construction of the TRIA would frustrate the statutory objective of ensuring that judgments rendered against terrorist states based upon terrorist acts "are to be enforced." 148 Cong. Rec. H8722-

06, H8728 (Nov. 13, 2002) (conference report); *see also* 148 Cong. Rec. S11524, S11528 (Nov. 19, 2002) (remarks of Sen. Harkin) ("Title II operates to strip a terrorist state of its immunity from execution or attachment in aid of execution by making the blocked assets of that terrorist state . . . available for attachment and/or execution. . . ."). Moreover, by including the phrase "seized by the United States" in section 201(d)(2)(A), it was Congress' intent to "include within the definition of 'blocked asset' any asset of a terrorist party that is held by the United States. This is intended as an explicit waiver of any principle of law under which the United States might not be subject to service and enforcement of any judicial order or process relating to execution of judgments, or attachments in aid of such execution, in connection with terrorist party assets that happen to be held by the United States." See 148 Cong. Rec. S11524, S11528-29 (Nov. 19, 2002). Furthermore, the House of Representatives Conference Report accompanying H.R. 3210 on November 13, 2002 states:

> It is the intent of the Conferees that Section 201 establish that such judgments are to be enforced. Section 201 builds upon and extends the principles in section 1610(f)(1) of the Foreign Sovereign Immunities Act (28 U.S.C. § 1610(f)(1)), authorizes the enforcement of judgments against any terrorist organizations and eliminates the effect of any Presidential waiver issued prior to the date of enactment purporting to bar or restrict enforcement of such judgments, thereby making clear that all such judgments are enforceable against any assets or property under any authorities referenced in Section 1610(f)(1).

H.R. CONF. REP. NO. 107-779, at 27 (2002).

It is conceivable that Iran would be entitled to immunity from execution under the provisions of the VCDR, Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502; the FMA, 22

U.S.C. § 4301 *et seq.*; or the FSIA, 28 U.S.C. § 1602 *et seq.*, were the Plaintiffs not proceeding under the TRIA. See generally *Hill*, 2003 U.S. Dist. LEXIS 3725, at *9; *Liberian Eastern Timber Corp. v. Government of Republic of Liberia*, 659 F. Supp. 606, 608 (D.D.C. 1987); But see *Birch Shipping Corp. v. Embassy of the United Republic of Tanzania*, 507 F. Supp. 311, 313 (D.D.C. 1980) (holding that "mixed accounts" used for both diplomatic and commercial purposes are not immune from execution under the FSIA). The doctrine that laws and treaties are equal in authority and the later in time prevails in case of conflict has been applied in several cases giving effect to a later act of Congress. See e.g. *Chae Chan Ping v. United States*, 130 U.S. 581, 600 (1889); *Diggs v. Shultz*, 470 F.2d 461, 466-67 (D.C. Cir. 1972) (upholding statute permitting imports contrary to United Nations Security Council embargo on Rhodesian products); see also RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES § 115 (1987). Therefore, because section 201 of the TRIA is later in time, it must be given effect.

## B.   THE REAL PROPERTIES ARE "BLOCKED ASSETS" UNDER THE TRIA.

In order for the Plaintiffs to be entitled to the execution or attachment of the properties they must first satisfy two requirements set forth in section 201(a) of the TRIA: (1) the judgment for compensatory damages that Plaintiffs seek to enforce was obtained against a state sponsor of terrorism for actions arising out of "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking or the material support or resources . . . for such an act if such act or provision of material support is engaged in by an official, employee, or agent of

18

such foreign state while acting within the scope of his or her office, employment or agency . . ." for which a terrorist party is not immune under 1605(a)(7) of the FSIA; and (2) assets subject to execution or attachment are actually "blocked." Pub. L. No. 107-297, Title II, § 201(a), 116 Stat. 2337 (2002); 28 U.S.C.A. § 1610 note.

There is no dispute as to whether the Plaintiffs satisfy the first requirement. Therefore, this Court must determine whether the Defendants' assets are in fact considered "blocked." The Plaintiffs argue that the condominiums are "blocked assets" within the meaning of the TRIA, and have not been used "exclusively for diplomatic purposes." The government, on the other hand, argues that the condominiums can not be attached because they are being used exclusively for diplomatic purposes.

On November 14, 1979, pursuant to the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, President Carter issued Executive Order 12170 blocking Iranian assets in the United States. Exec. Order No. 12,170, 44 FR 65729 (1979), *reprinted in* 50 U.S.C.A. § 1701 note. Iran was permitted to continue occupying its embassy, consulates, and diplomatic residences. United States' Motion to Quash Writs of Attachment, Ex. A, Declaration of Francis X. Taylor, at ¶ 5.

On April 7, 1980, President Jimmy Carter, pursuant to his constitutional authority to conduct foreign affairs, severed diplomatic relations with Iran and stated that the Secretary of State had informed the Government of Iran that its Embassy and consulates in the United States were to cease their activities immediately, and that all Iranian diplomatic and consular

officials had been declared *persona non grata* and were to leave the United States by midnight of the following day. *Id.* ¶ 6. By diplomatic note dated April 7, 1980, the Secretary of State informed the Embassy of Iran that on April 8, 1980, the Embassy and consulates would be closed and sealed, except to the extent that the Department may authorize any particular use of such premises by a protecting power. *Id.* ¶¶ 7, 8. The United States is currently leasing, or has in the past leased, all but one of the thirteen Iranian diplomatic properties within the custody of the Department of State. *Id.* ¶¶ 14-27

Although the condominiums in dispute have been designated blocked assets under Executive Order 12170, this Court must look at the definition given to the term "blocked asset" in the TRIA:

> (A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and

> (B) does not include property that—

>> (i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 et seq.); or

>> (ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, Title II § 201(d)(2), 116 Stat. 2339-40 (2002); 28 U.S.C.A. § 1610 note.

Whether the condominiums may be used to satisfy the Hegnas' judgment turns on whether they are used exclusively for diplomatic purposes. The United States argues that an appropriate method of "protect[ing] the property under Article 45 of the [VCDR] (and Article 27 of the [VCCR]) is to have the property occupied and generating income needed for maintenance and repair." Motion to Quash Plaintiffs Writs of Attachment, at 8-9. Thus, the argument follows that the property falls under the exclusion laid out in § 201(d)(2)(B)(ii) because protection of the property is exclusively a diplomatic purpose.

Congress' intent may be discovered by looking at the language, structure, subject matter, context, and history of a statute. *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1009 (7th Cir. 2002). The court begins with the language of the statute itself. *U.S. v. Wagner*, 29 F.3d 264, 266 (7th Cir. 1994). Although the presidential waiver section is not at issue in this particular instance, this Court will consider the language of the entire statute. As noted in section IV.A above, the presidential waiver does not apply to property subject to the VCDR or the VCCR that "has been used by the United States for any non-diplomatic purpose (including use as a rental property), or the proceeds of such use. . . ." Terrorism Risk Insurance Act, Pub. L. No. 107-297, Title II § 201 (b)(2)(A), 16 Stat. 2337 (2002); 28 U.S.C. A. § 1610 note.

First, the Court finds it persuasive that the statute describes use as a rental property as a non-diplomatic purpose. Second, the presidential waiver section and the remainder of

21

Title II were enacted simultaneously. Furthermore, despite the government's argument that the property is being rented as a means of preservation, it concedes in its brief that the rental proceeds have been designated by Congress for payment to certain individuals pursuant to the VTVPA. Moreover, the government acknowledges that to the extent these funds are so designated, they are not being preserved for a diplomatic purpose.

In addition, the primary rule of statutory interpretation is that words used in statutes must be given their ordinary and plain meaning. *Zeigler Coal Co. v. Director, Office of Workers' Comp. Programs*, 326 F.3d 894, 900 (7th Cir. 2003). The dictionary defines "exclusive" as, "[r]elating to or marked by exclusion . . . [n]ot shared with others . . . [i]ndependent or single: sole. . . ." WEBSTER'S II NEW RIVERSIDE UNIV. DICTIONARY 450 (1994). Accordingly, the Court finds that to be excluded from the definition of blocked assets, the property must be used *solely* for diplomatic purposes.

Finally, a court may look to the legislative history when interpreting the meaning of a statute and Congress' intent. *United States v. Markgraf*, 736 F.2d 1179, 1182 (7th Cir. 1984). In *Flatow v. Islamic Republic of Iran*, the court denied the plaintiff's attempt to attach Iranian diplomatic and consular properties, noting that until Congress decides to enact a law that authorizes the attachments of property used for diplomatic purposes, the district court lacks the proper means to assist the plaintiff. 76 F. Supp. 2d 16, 27-28 (1999) (citing Bill to Modify the Enforcement of Certain Anti-Terrorism Judgments, and for Other Purposes, S. 1796, § 1(3)(A), 106th Congress (1999) (proposed but rejected bill that would have amended

section 1610(f) of the FSIA to permit the attachment of foreign mission property used for non-diplomatic purposes such as rental property, as well as rental proceeds)).

It appears clear that Congress' enactment of the TRIA was designed to answer the problem presented in *Flatow*. During the Senate's consideration of Title II of the TRIA, the Congressional Budget Office ("CBO") prepared a report that made it clear that the intent of the bill was to subject the blocked assets of state sponsors of terrorism to attachment and execution, including the properties falling within the scope of the Vienna Conventions. Terrorism Victim's Access to Compensation Act of 2002: Congressional Budget Office Cost Estimate, at 3 (Aug. 28, 2002). According to the Office of Foreign Missions Assets Control, the "blocked assets of Iran are primarily properties associated with their former diplomatic mission to the United States" and because that property has recently been used for non-diplomatic purposes, the "exception to the waiver [in section 201(b)(2)] would weaken the President's ability to protect it from court judgments." *Id*. This Court finds that the condominiums in question are blocked assets because they are not used *exclusively* for diplomatic purposes.

## C.   BECAUSE PLAINTIFFS' ELECTED TO RECEIVE PAYMENT UNDER THE VICTIMS OF TRAFFICKING AND VIOLENCE PROTECTION ACT OF 2000, THE WRIT OF ATTACHMENT AND MOTION FOR A TURNOVER ORDER MAY BE MOOT.

The Plaintiffs have applied for payment pursuant to section 2002 of the VTVPA. The Office of Foreign Assets Control has determined that each Plaintiff in this case is eligible for payment. According to the government, however, the plaintiffs are required to relinquish all

rights and "claims to punitive damages awarded" in their suit against Iran. Pub. L. 106-386, § 2002(a)(2)(C), 114 Stat 1541-43, (2000). The government further indicated that the Secretary of the Treasury was ready to make payments to the Plaintiffs per their request.

In order to withdraw their application before pro rata section 2002 payments are distributed, Plaintiffs were required to do so in writing by July 7, 2003. It is this Court's understanding that the Plaintiffs did not notify in writing their withdrawal of a Section 2002 application as required. Instead, the Plaintiffs filed a request for a temporary restraining order seeking to restrain John W. Snow, in his capacity as Secretary of the Treasury and R. Richard Newcomb, in his capacity as Director of the Office of Foreign Assets Control, from taking any action on and after July 7, 2003 to compel the Plaintiffs to elect between the remedies available to them by law to either: (1) assign their judgments in exchange for the payments to which they are lawfully entitled, under the VTVPA, and forego their judicial attachment remedies; or (2) to proceed with their attachment of Iranian assets in aide of execution on their judgments in this Court, pursuant to the TRIA.

On July 15, 2003, the United States District Court for the District of Columbia denied Plaintiffs' motion in *Edwena R. Hegna, et al. v. John W. Snow and R. Richard Newcomb*, Civil Action No. 03-1479 (HHK). Therefore, the Plaintiffs in this case may be precluded from attaching the condominiums this Court believes they are entitled to depending upon the final outcome of this case.

## V. CONCLUSION

For the reasons stated herein, **it is recommended that the Court DENY the United States' motion to quash the writs of attachment and GRANT the Plaintiffs' motion for a turnover order. It is further recommended that the turnover be stayed pending final resolution of the District of Columbia case.**

Respectfully Submitted,

**MORTON DENLOW**
**United States Magistrate Judge**

Date: August 11, 2003

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the Magistrate Judge's Report and Recommendation. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. 636(b)(1)(B); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 329 (7th Cir. 1995); *The Provident Bank v. Manor Steel Corp.*, 882 F.2d 258 (7th Cir. 1989).

**Copies mailed to:**

Michael A. Snyder
James J. Kupka
CONKLIN, MURPHY, CONKLIN & SNYDER
53 West Jackson Blvd., Suite 1150
Chicago, Illinois 60604


Attorneys for Plaintiffs

Thomas P. Walsh
Chief of the Civil Division
OFFICE OF THE UNITED STATES ATTORNEY
219 South Dearborn Street
Suite 500
Chicago, IL 60604

Jennifer Paisner
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Room 6108
Washington, D.C. 20530

Attorneys for the United States